**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SUZANNE F. TIELLE,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:17-2417** |
| **v.** | : | **JUDGE MANNION** |
| **THE NUTRITION GROUP d/b/a NUTRITION, INC.,** | : | |
| | : | |
| **Defendant** | | |

## MEMORANDUM

Pending before the court, in this disability discrimination action filed by plaintiff Suzanne F. Tielle, are cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56 filed by plaintiff, (Doc. 16), and her former employer, defendant The Nutrition Group ("TNG") d/b/a Nutrition, Inc., (Doc. 19). Based upon the court's review of the motion and related materials, the defendant's motion will be **GRANTED** with respect to all of plaintiff's claims in her amended complaint, (Doc. 14). The plaintiff's motion for partial summary judgment regarding her disability discrimination claims will be **DENIED**.


## I.    BACKGROUND

The plaintiff has brought the instant action under the Americans with Disabilities Act, as amended ("ADAAA"), 42 U.S.C. §12131, *et seq*., as well as under the Pennsylvania Human Relations Act, ("PHRA"), 43 P.S. §951, *et*

*seq.*[1] She filed her original complaint on December 29, 2017. (Doc. 1). Plaintiff then filed her amended complaint on June 29, 2018. (Doc. 14). Specifically, in Count I, plaintiff raises her combined claims under the ADAAA and the PHRA alleging disability discrimination, failure to accommodate and retaliation. She alleges that she had a knee disability and was regarded as being disabled. Plaintiff alleges that she could perform the essential functions of her head cook position with an accommodation, namely, the use of a food cart, but that TNG did not allow her to use the cart. Plaintiff alleges that she was terminated on November 7, 2016 because of her disability. She also alleges that she was terminated "in direct retaliation for having requested a reasonable accommodation of being allowed to use a cart to complete her work duties and because of her disability."

After completing discovery, the plaintiff filed her motion for partial summary judgment on December 6, 2018 with respect to her disability discrimination claims under the ADAAA and the PHRA, pursuant to Fed. R.

---

[1]The "analysis of an ADA claim applies equally to a PHRA claim." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)). Although the Pennsylvania legislature has failed to enact amendments to the PHRA similar to the ADAAA, "because [plaintiff] is unable to prove that [TNG's] reasons for terminating her were pretextual under either the motivating or determinative factor test, her ADA and PHRA claims can, and will, be considered together." Bielich v. Johnson & Johnson, Inc., 6 F.Supp.3d 589, 602 (W.D.Pa. 2014) (citations omitted). As such, the court will discuss all of the plaintiff's ADAAA and PHRA claims together.

Civ. P. 56.[2] (Doc. 16). TNG filed it motion for summary judgment on December 27, 2018 with respect to all of plaintiff's claims in her amended complaint. Both motions have been briefed and, statements of material facts and responses as well as exhibits were filed.[3]

This court's jurisdiction over the plaintiff's federal claims is based on 28 U.S.C. §1331. The court can exercise supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. §1337.

## II.    MATERIAL FACTS[4]

The undisputed facts, as supported by the record, establish that the

---

[2]Since both parties state the correct standard of review applicable to a summary judgment motion, the court will not repeat it. Suffice to say that to prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact and, that the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *See* Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

[3]Although the parties originally filed portions of their documents under Seal, the court denied TNG's motions to file the documents under Seal and they were re-filed without containing any redacted portions. On August 1, 2019, plaintiff re-filed her motion for partial summary judgment, (Doc. 45), as well as her brief and supporting documents. On August 6, 2019, TNG re-filed its motion for summary judgment, (Doc. 49), as well as its brief and supporting documents.

The court directed the clerk of court to substitute the unredacted filings of the parties for the redacted filings and to term the re-filed documents so that all of the filing dates reflect the timely dates on which the documents were originally filed. As such, the Docs. 45 and 49 motions were termed since they became the Docs. 16 and 19 original motions.

[4]The court notes that it only includes material factual statements with support in the record. Legal arguments and conclusions are not included.

plaintiff worked from 1986 until 2009 for Aramark, a food service management company, as Kitchen Lead/Head Cook in the Old Forge School District. In 2009, TNG became the food service management company in the district and plaintiff became an employee of TNG working in her same position.

During her employment at the Old Forge School District, plaintiff was a member of the Service Employees International Union ("SEIU").

Plaintiff's job duties with TNG, included the following: 1) being the lead person in the kitchen to supervise other food service workers; 2) maintaining all production records according to PDE, HACCP, and Nutrition Group; 3) ordering and receiving all bread; 4) ensuring that time sheets were filled out by employees; 4) recording of inventory; and 5) assisting FSD with food cost controls and food quality issues. Plaintiff read and agreed to her job duties. Based on her job duties, plaintiff was allowed to use one of the food carts to transport food, kitchen items and supplies in the kitchen and around the school.

Plaintiff testified that she was in charge of nine other employees. She stated that they cooked and served breakfast, and then prepared lunch. After the meals, they would clean up the kitchen and put the food away.

Plaintiff testified that she injured her right knee in 2005 and tore her meniscus, and wore knee braces. Plaintiff also stated that she developed very bad arthritis in her knee. She stated that she was prescribed Naproxen for her knee, that she had cortisone shots every year since her injury and, that she

4

has a noticeable impairment in her ability to walk. When plaintiff became an employee of TNG in 2009, she told Patricia Baresse, then Regional Manager and current Director of Operations for TNG, and other TNG's representatives that she had a knee injury and that she had trouble with her legs, and she described herself as "disabled." However, at this time, plaintiff did not provide TNG with any documentation showing that she was disabled. Nor did she indicate that she was unable to perform her job responsibilities without an accommodation, and she did not request an accommodation.

In August 2011, Baresse and other representatives of TNG observed plaintiff routinely asking her co-workers to retrieve kitchen items for her, and they became concerned about whether plaintiff could perform all of her job duties. TNG requested plaintiff to have her doctor review her job description and determine whether she was able to perform the duties of her position. Plaintiff's doctor, Dr. Daniel Kazmierski, reviewed her job description and wrote a note stating, "okay for patient to perform said duties." Dr. Kazmierski did not indicate that plaintiff needed an accommodation to perform any of her job duties. Plaintiff then gave Dr. Kazmierski's note to TNG in August 2011.

For months during 2014, Baresse and other representatives of TNG saw plaintiff using a kitchen food cart to support her weight and to assist her with walking in the kitchen, to and from the restroom, to and from the back door of the school building, and to other areas of the school. Plaintiff was also observed placing the food cart by the back door of the school when she left work for the day and then use the cart to assist her with walking when she

arrived at the school the next day.[5]

The food carts are used to transport food as well as equipment and supplies in the kitchen and throughout the school. Food carts are not intended to assist a person with walking since they can tip if supporting a person's weight. Further, there is no dispute that a food cart is not a medical device.

TNG determined that plaintiff's use of the food cart to assist her with walking was unsafe and in violation of TNG's safety policy since it put the safety of plaintiff and others at risk.

TNG has an Employee Safety Manual and Safety Policies. TNG's Safety Manual and its safety policies require that all its employees perform their duties in a safe manner to prevent injury to themselves and others. Plaintiff was trained on TNG's safety policies and she was given a copy of the Employee Safety Manual. She read, understood and accepted all of TNG's safety policies. TNG's Safety Manual directed employees to use a "cart" for specific tasks and instructed to use a cart "[i]f a load is too heavy or bulky." The Manual did not provide that food carts should be used to support an employee's weight. In fact, plaintiff admitted that the food cart was not intended to be used to assist someone with walking or as a crutch. Further, while plaintiff admitted that the food cart was intended to transport food and other kitchen items, she believed that it was "not going to hurt anything [or cause a problem] if a person has any type of [medical] issue [and] uses it."

---

[5]TNG's Ex. 15 is a photograph of one of the food carts which plaintiff admitted she used.

Since plaintiff was repeatedly observed using a food cart to support her weight and to assist her with walking, on June 13, 2014, Baresse, Karen Baranowski, TNG cashier and the Union Shop Steward for SEIU, Tracy Drank, TNG's Food Service Director, Kim Yost, SEIU representative, and Ian O'Brien, TNG's general counsel, met with plaintiff and told her that using the food cart for these purposes was unsafe because it was not intended for such use. Plaintiff was also advised that using the cart in the stated manner violated TNG's safety policy because it was a safety risk. As such, plaintiff was specifically told that she could not use the food cart while at work to support her weight or for assistance for walking. Plaintiff then requested to use a cane at work to assist her when walking and TNG granted her request.

In the meeting, plaintiff avers that she requested to use the food cart as an accommodation to help her walk due to her knee disability. However, according to Baresse, Baranowski and Drank, plaintiff did not request to use the food cart in the meeting to assist her with walking.[6] In any event, if plaintiff did in fact request to use the food cart as an accommodation to help her with walking, TNG would have denied the request due to safety concerns. Further, TNG allowed plaintiff at all times to continue to use the food cart for its intended purpose of transporting food, kitchen equipment and supplies in the kitchen and around the school.

Despite the fact that TNG had already granted plaintiff's request to use

---

[6]The court denied plaintiff's motion to strike the Affidavits of Baresse, Baranowski and Drank.

a cane at work at the June 13, 2014 meeting, she contacted her physician, Dr. Kazmierski, on July 24, 2014 and requested a note stating that she could work but required the assistance of a cane. Plaintiff then gave TNG a note from Dr. Kazmierski stating that she "requires assistance of a cane when walking due to a knee injury. This is recommended by me for assistance when working." TNG again allowed plaintiff to use a cane at work and expected that she would indeed use the cane while at work.

Thereafter, plaintiff did in fact use her cane to assist her at work for some time. At no time did plaintiff state that she was unable to perform her duties with her cane or that she needed any other accommodation.

According to plaintiff, in June 2015, Baresse asked her if she was coming back to work for the Fall school term and plaintiff replied "yes, why." Baresse then told plaintiff that she "better be able to walk better and get [her] own stuff." Plaintiff responded that "this is as good as I am going to get." Baresse denied making the alleged statements and denied making any statements to plaintiff regarding her knee or her ability to walk and retrieve items in the kitchen. Regardless, plaintiff then returned to work for TNG at the Old Forge School in the Fall of 2015 and she continued to work there until November 2016.

When plaintiff returned to work in the Fall of 2015, Baresse and other representatives of TNG again observed plaintiff using the food cart to assist her with walking and to support her body weight in place of her cane.

On December 17, 2015, plaintiff received two Employee Warning

Notices for Unsatisfactory Performance and conduct that interfered with work or school district operations. The Employee Warning Notices were issued to plaintiff regarding the meetings that were held with her to address her continued improper use of the food cart in a manner which violated TNG's Safety Policy.

On January 28, 2016, Baresse along with representatives of TNG, namely, Susan Benczkowski, TNG's Regional Manager, Yost, Baranowski, and Drank, again met with plaintiff to discuss her continued use of the food cart to help her walk at work. Plaintiff was told that she was again seen using the food cart to assist her with walking and she was reminded that using the food cart for such purpose was unsafe and violated TNG's safety policy. Specifically, plaintiff was told that her use of the food cart put her safety and the safety of others at risk, and that she could not use the food cart to help her walk or support her weight. Further, plaintiff was advised that since TNG granted her request to use her cane at work, she should use the cane and not the food cart.

Additionally, at the January 28, 2016 meeting, plaintiff did not contend that she was unable to perform her duties with her cane and she did not state that she needed any additional accommodation at work. Plaintiff also apologized for using the food cart in an unintended manner and, she assured TNG's representatives that she would use her cane in the future and not the food cart to assist her with walking. Finally, plaintiff was told by TNG that if she continued to use the food cart to assist her with walking in violation of the

9

TNG's safety policy, she would be terminated.

In her deposition, plaintiff testified that she used the food cart "for assistance to get around the kitchen." She also testified that "it would be foolish for me to walk with my cane to then go get the cart to then go get what I was going to do, if I was going to get food or bring things to the dish room. So that cart was with me most of the time."

Despite the repeated warnings and meetings, despite the fact that TNG granted plaintiff's requested accommodation to use her cane, as recommended by her doctor, and despite the fact that plaintiff agreed to use her cane and not the food cart for walking, plaintiff was once again observed by several representatives of TNG using the food cart to assist her with walking while at work. In particular, Baresse saw plaintiff in the walk-in freezer without her cane and using the food cart for support. According to Baresse and Barnowski, plaintiff was holding onto a freezer shelf with one hand and onto an empty food cart located outside of the freezer with her other hand to support her weight.

Consequently, another meeting with plaintiff was held on November 7, 2016. Present at the meeting were Baresse, Benczkowski, Yost, and Baranowski. During this meeting, plaintiff did not deny using the food cart to help her with walking and to support her weight. In fact, she admitted, "sometimes it's just quicker to use the cart instead of the cane." Plaintiff also testified that at some point during the meeting she recalls Baresse saying "something about a liability", but she could not remember exactly what was

stated. However, Baresse explained to plaintiff that "using the food cart to support her weight and assist her with walking was a liability because it was unsafe." Baresse denied making any comment that plaintiff's disability was a liability. Further, although plaintiff testified Baresse told her that she was not allowed to go back into the kitchen and that Baresse "in fact, forbade her" to work, Baresse denied making these statements. Rather, Baresse stated she informed plaintiff that she could no longer allow her to use the food cart to assist with her walking because of safety concerns and that TNG was terminating her employment. In fact, plaintiff also testified that it was her belief that she was terminated because of her use of the food cart.

At the end of the meeting, TNG terminated plaintiff's employment based on her continued use of the food cart in violation of TNG's safety policy and TNG's directives not to use the cart to assist her walking.

## III. DISCUSSION

Plaintiff alleges that TNG terminated her based on her known and perceived knee disability in violation of the ADAAA and the PHRA. She also alleges that TNG failed to provide a reasonable accommodate for her disability and, that TNG retaliated against her by terminating her in November 2016 due to her June 2014 request for a reasonable accommodation.

### A. Legal Standard for Plaintiff's Claims

The burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to the plaintiff's retaliation and discrimination

claims under the ADAAA and the PHRA in cases, like the instant one, where the plaintiff relies on circumstantial evidence.[7] *See* <u>Gavurnik v. Home Properties, L.P.</u>, 227 F.Supp.3d 410, 416 (E.D.Pa. 2017), aff'd. 712 Fed.Appx. 170 (3d Cir. 2017); <u>Williams v. Phil. Hous. Auth. Police Dept.</u>,380 F.3d 751, 760 (3d Cir. 2004) (citation omitted); <u>Wells v. Retinovitreous Associates, Ltd.</u>, 702 Fed.Appx. 33, 35 (3d Cir. 2017).

The court in <u>Decker v. Alliant Technologies, LLC</u>, 871 F.Supp.2d 413, 425 (E.D.Pa. 2012), explained the *McDonnell Douglas* burden-shifting framework as follows:

> If the plaintiff establishes a prima facie case of [retaliation or] discrimination, then an inference of discriminatory motive arises and the burden shifts to the employer to articulate a legitimate, [nonretaliatory] nondiscriminatory reason for the adverse employment action. *See* <u>Salley v. Circuit City Stores, Inc.</u>, 160 F.3d 977, 981 (3d Cir. 1998). If the employer does so, then the burden shifts back to the plaintiff to show that the employer's proffered reason is merely pretext for intentional discrimination. Makky, 541 F.3d at 214. The "ultimate burden of persuading the

---

[7]Contrary to the plaintiff's contention, the court does not find direct evidence of discrimination based on the alleged June 2015 incident, described above, in which plaintiff claims that Baresse asked her if she was coming back to work for the Fall 2015 school term. Even though Baresse was a decision maker, the law is clear that statements made by a decision maker "unrelated to the decisional process itself are not direct evidence." <u>Glanzman v. Metropolitan Management Corp.</u>, 391 F.3d 506, 513 (3d Cir. 2004) (citation omitted). Here, the undisputed evidence shows that after Baresse's alleged statements, plaintiff did in fact return to work for TNG in the Fall of 2015, she was allowed to use her cane at work, and she continued to work for over one year until she was terminated in November 2016. Thus, the alleged statements of Baresse, made well before plaintiff's termination, were not timely related to the decisional process and are not direct evidence of discrimination.

trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *See* Williams v. Phila. Housing Auth. Police Dep't, 380 F.3d 751, 759 n. 3 (3d Cir. 2004) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

"The burden to establish a prima facie case is a not an onerous one, but a prima facie case can allow a court 'to eliminate the most obvious, lawful reasons for the defendant's action.'" *Id*. (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999).

### B.    *Disability Discrimination Claims*

Plaintiff claims TNG violated the ADAAA since she was terminated due to an actual or perceived impairment, namely her knee disability. She contends that she requested a reasonable accommodation from TNG to assist her walking at work when she asked for permission to use the food cart. Plaintiff maintains that TNG then retaliated against her after she requested the accommodation.

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a). To establish a prima facie case of disability discrimination under the statute, the plaintiff must show: "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by

13

the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination." Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999) (citing Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir. 1998)). The ADA defines a "disability" with respect to an individual as: "(a) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) a record of such impairment; or (c) being regarded as having such an impairment." 42 U.S.C. §12102(1).

Thus, to establish a "disability" under the ADA, plaintiff must prove that she is substantially limited in performing a major life activity. *See* 42 U.S.C. §12102. The ADA Amendments Act of 2008 ("ADAAA") expanded the scope of disability and construed the definition of disability in favor of broad coverage. *See* Kieffer v. CPR Restoration & Cleaning Service, LLC, 200 F.Supp.3d 520, 533-34 n.9 (E.D.Pa. 2016) (court noted that the ADAAA lowered the standard for finding a disability under the ADA). Nonetheless, the ADAAA's definition of "disability" still remains as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. §12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §12102(2)(A). Further, with respect to the "'physical or mental impairment' prong of the definition of a disability, EEOC regulations clarified that 'the determination of whether an impairment substantially limits a major

life activity requires an individualized assessment' and 'should require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA." Riley v. St. Mary Medical Center, 2014 WL 220734729, *2 (E.D.Pa. May 28, 2014) (citations omitted). However, "[n]ot every impairment will constitute a disability" within the meaning of the ADA. Koller v. Riley Riper Hollin & Colagreco, 850 F.Supp. 2d 502, 513 (E.D.Pa. 2012). Under the ADAAA, the qualifying impairment must still create an "important" limitation. *Id*. Further, in order to establish a prima facie case of disability discrimination under the ADAAA, the burden remains on a plaintiff to establish a causal nexus between her disability and the adverse employment action. Jakomas v. City of Pittsburgh, 342 F.Supp.3d 632, 650 (W.D.Pa. 2018).

Here, the plaintiff's claim of disability discrimination in her amended complaint is based on an actual disability with respect to her knee injury as well as a "regarded-as" disability. TNG argues that it is entitled to summary judgment in this disparate treatment case because the plaintiff has not offered sufficient evidence to establish a prima face case of discrimination. TNG concedes, for purposes of its instant motion, that plaintiff has a disability, that she is a qualified individual with a disability, and that her termination was an adverse employment decision. However, TNG contends that plaintiff cannot prove that its action in terminating her was taken because of her disability and that there is no evidence showing that her termination was a pretext for discrimination. TNG also argues that the plaintiff fails to show that its

15

legitimate reason for terminating her, i.e., her continued use of the food cart to assist her walking in violation of its directive, was a pretext for discrimination. The court finds that plaintiff has failed to meet her burden of establishing that her termination was causally related to her disability or to her request for an accommodation.

Plaintiff has failed to present sufficient evidence to show a causal nexus between her knee disability and her termination. No doubt that "mere awareness of a disability does not create an inference of discrimination." Drummer v. Trustees of University of Pennsylvania, 286 F.Supp.3d 674, 683 (E.D.Pa. 2017) (citation omitted). Rather, a plaintiff must "adduce sufficient evidence demonstrating that she suffered any adverse action 'as a result of' or 'because of' her disabilities." Moore v. CVS Rx Services, Inc., 142 F.Supp.3d 321, 346 (M.D.Pa. 2015). "ADA [p]laintiffs must prove that they were treated differently based on the protected characteristic, namely the existence of their disability.'" Id. (quoting CG v. Pennsylvania Dep't of Educ., 734 F.3d 229, 236 (3d Cir. 2013)). "This requires a showing that the disability 'played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process.'" Id. (citing New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 301 n. 4 (3d Cir. 2007)).

Plaintiff worked for TNG from 2009 through November 2016, and she made TNG aware of her knee disability when she began to work for it. Plaintiff presented evidence to show that she had a knee disability which limited her

ability to walk. Nonetheless, as detailed above, the evidence shows that during plaintiff's employment with TNG she was repeatedly observed using the food cart to assist her walking while at work. The evidence also shows that plaintiff was repeatedly told not to use the food cart to assist her walking and that such use of the cart was dangerous and violated TNG's safety policy. Plaintiff was not prevented from using the food cart for its proper purpose of transporting items in the kitchen and around the school. Plaintiff was then forewarned, prior to her termination, that if she continued to use the food cart in the stated manner, she would be terminated. Also, plaintiff was provided a reasonable accommodation for her knee disability when TNG allowed her to use her cane to assist her walking and performance of her kitchen duties, as her own doctor recommended.

At the meetings TNG conducted after plaintiff was observed using the food cart to walk, plaintiff agreed not to use the food cart in the prohibited manner. However, she continued to use the food cart to assist her walking while at work. She was repeatedly observed by Baresse and other TNG representatives using the food cart to walk. In fact, during the meetings, she did not deny using the food cart for walking, and she stated that the cart was "quicker" to use despite her knowledge that using the cart to help her walk was in clear violation of TNG's directives. In her deposition, plaintiff admitted that she was terminated "because of the cart."

Further, although plaintiff could not remember the exact statement, she claims that during the November 2016 final meeting, Baresse mentioned

"something about a liability" suggesting that Baresse was referring to her disability as a liability. Plaintiff also indicated that she was not sure whether Baresse was referring to her as a liability or the use of the cart. However, Baresse clarified her statement when she averred that she told plaintiff "using the food cart to support her weight and assist her with walking was a liability because it was unsafe." Indeed, this is precisely what TNG representatives repeatedly told plaintiff during the earlier meetings. In short, there is simply no evidence that plaintiff's disability had any connection to TNG's decision to terminate her.

Thus, plaintiff has failed to establish a prima face case of disability discrimination since she has not presented sufficient evidence as to the third element, i.e., her termination was the result of her disability. Moreover, assuming *arguendo* that plaintiff did establish a prima face case of disability discrimination, TNG has presented an abundance of evidence showing that it had a legitimate non-discriminatory reason for plaintiff's termination.

In Howell v. Millersville Univ. of PA.*,* 283 F.Supp.3d 309, 323, (E.D.Pa. 2017), the court explained:

> If a plaintiff establishes a prima facie case, "the burden of production (but not the burden of persuasion) shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that the defendant had a legitimate, nondiscriminatory reason for the adverse employment decision." [Kautz v. Met–Pro Corp., 412 F.3d 463, 465 (3d Cir. 2005)] (internal citations and quotations omitted). An employer need not prove, however, that the proffered reasons actually motivated the employment decision. *Id.* If a defendant satisfies this burden, a plaintiff may then survive summary judgment by submitting

> evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Id*.

*See also* Smith v. City of Allentown, 589 F.3d 684, 689 (3d Cir. 2009).

Thus, the court turns to the second step of the *McDonnell Douglas* framework. "At the second step of the *McDonnell Douglas* framework, the employer satisfies its 'relatively light' burden of production by introducing evidence which, taken as true, would permit a conclusion that there was a nondiscriminatory reason for its employment decision." Terrell v. Main Line Health, Inc., 320 F.Supp.3d 644, 657 (E.D.Pa. 2018) (citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)).

Here, TNG has met its burden by submitting a substantial amount of evidence that its proffered reason for terminating the plaintiff, i.e., her repeated use of the food cart to assist her with walking at work in violation of TNG's directive and safety policy, was a legitimate nondiscriminatory safety reason for plaintiff's termination.

Next, the court considers pretext. The plaintiff must demonstrate that TNG's proffered reason was a pretext for disability discrimination.

As such, "the burden shifts back once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." Terrell, 320 F.Supp.3d at 658 (citation omitted). The plaintiff must now prove pretext by either discrediting

defendant's proffered reason for her termination or showing that disability discrimination was more likely than not the "but for" cause of her termination.

In order to show pretext, "the employee must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a . . . determinative cause of the employer's action."[8] Fuentes, 32 F.3d at 763. In order to "discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." Fuentes, 32 F.3d at 765. "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence', [Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)], and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Id. (citing Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)). Further, "the plaintiff 'must show[ ] not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that

---

[8]"The determinative factor, or 'but for,' test applies to [plaintiff's] disability claims", both her disability discrimination claims and her retaliation claims. Bielich, 6 F.Supp.3d at 605 n. 2 (citations omitted).

it cannot have been the employer's real reason.'" <u>Proudfoot v. Arnold</u> <u>Logistics, LLC</u>, 629 Fed.Appx. 303, 307 (3d Cir. 2015) (citation omitted). *See* *also* <u>Andersen v. Mack Trucks, Inc.</u>, 118 F.Supp. 3d 723, 747 (E.D.Pa. 2015) ("In a discrimination case, the issue before the court is not the fairness of an employer's decision to terminate the plaintiff, but whether the record raises an issue of fact as to whether the decision was motivated by discriminatory animus.") (citation omitted).

TNG argues that the plaintiff has failed to establish by a preponderance of the evidence that its proffered legitimate, non-discriminatory reason for her termination was pretextual. TNG points out that its evidence shows the plaintiff was given repeated warnings about using the food cart to assist her with walking and, that she was given several chances to conform her conduct to comply with TNG's safety policy and to use her cane, but that she continually failed to follow TNG's directives by using the cart to walk and help support her weight. The court finds that the facts discussed above support TNG's contentions. Simply put, plaintiff fails to "point[ ] to evidence from which a factfinder could reasonably conclude that discrimination was the more likely cause of h[er] discharge." <u>Fuentes</u>, 32 F.3d at 763.

The plaintiff's evidence "would [not] cause a reasonable factfinder to find the defendant's proffered reason 'unworthy of credence.'" <u>Burton v. Teleflex</u> <u>Inc.</u>, 707 F.3d 417, 430 (3d Cir. 2013). Thus, the court finds that the plaintiff has failed to meet her burden by establishing pretext under the first *Fuentes* method.

The court in <u>Terell</u>, 320 F.Supp.3d at 658-59, discussed the second method of establishing pretext and stated:

> Under the second prong of *Fuentes*, a plaintiff may establish pretext "by presenting evidence 'with sufficient probative force' so as to allow the factfinder to 'conclude by a preponderance of the evidence that [her disability] was a motivating or determinative factor.'" <u>Willis</u>, 808 F.3d at 645 (quoting <u>Simpson</u>, 142 F.3d at 644-45). This proof may consist of evidence that: "(1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated [persons not within the protected class] more favorably." *Id.* With regard to workplace discipline, the relevant factors to consider in determining whether individuals are "similarly situated" may include a "'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish the conduct or their employer's treatment of them.'" <u>McCullers v. Napolitano</u>, 427 Fed.Appx. 190, 195 (3d Cir. 2011) (quoting <u>Radue v. Kimberly–Clark Corp.</u>, 219 F.3d 612, 617–18 (7th Cir. 2000)).

There is no evidence that TNG previously discriminated against the plaintiff based on her disability. In fact, TNG granted plaintiff's requested reasonable accommodation to use her cane at work when she first requested it. However, plaintiff continually used the food cart to assist her walking after being repeatedly directed not to use it for that purpose. Nor is there any evidence that TNG discriminated against other persons within the plaintiff's protected class or within another protected class. Additionally, no evidence was presented that TNG treated more favorably similarly situated persons not within the protected class. Although plaintiff now contends that "other

non-disabled workers were allowed to use the food cart to complete their work duties; and therefore, treated better than her", she testified in her deposition that "other non-disabled workers" used the food cart to move items, such as food, pots and pans, but they did not use the food cart to assist them with walking in the kitchen. Here, the evidence shows that plaintiff was also allowed to use the food cart to move items in the kitchen and to use it in accordance with its intended purpose.

The court finds that the plaintiff's evidence fails to create a genuine issue of material fact to show that TNG's nondiscriminatory reason for her termination was pretextual. No reasonable jury could find that the reasons for plaintiff's termination "were a fabrication or that discrimination [due to her knee disability] was more likely than not the motivating or determinative cause of plaintiff's termination." Willis, 2 F.Supp.3d at 606.

Thus, since plaintiff's evidence is insufficient to show disability discrimination by TNG under the ADAAA, the court will grant TNG's summary judgment motion with respect to this claim and deny plaintiff's motion. Since the same standard applies to plaintiff's disability discrimination under the PHRA, TNG is also entitled to summary judgment on this state law claim as well. Bialko v. Quaker Oats Co., 434 Fed.Appx. 139, 142 (3d Cir. 2011) ("The analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively indistinguishable from that under the ADA, thus allowing courts to dispose of both ADA and PHRA claims on the same grounds."); Willis, 2 F.Supp.3d at 604 n. 10 ("Courts within this Circuit interpret

23

the ADA and PHRA coextensively.") (citation omitted).

### C.   Retaliation Claims

Under the ADA, employers are prohibited from retaliating against their employees for requesting accommodations for disabilities. Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 188 (3d Cir. 2010). "To establish a prima facie case of unlawful retaliation in violation of the ADA, a plaintiff must show that he engaged in protected activity, that he suffered adverse action either after or contemporaneous with the protected activity, and that there was a causal connection between the employee's protected activity and the employer's adverse action." Canevari v. Itoh Denki U.S.A., Inc., (M.D.Pa. July 24, 2017) 2017 WL 4080548, *13 (citations omitted), adopted by 2017 WL 4077394 (M.D.Pa. Sep. 14, 2017). "An employee engages in protected activity when he requests a reasonable accommodation for his disability under [ ] the ADA [ ]." Id. (citation omitted). An employee does not have to show that she was disabled to assert a retaliation claim under the ADA. Gavurnik v. Home Properties, L.P., 227 F.Supp.3d 410, 420 (E.D.Pa. 2017) (citations omitted). Thus, a plaintiff may pursue her ADA retaliation claim despite the fact that her underlying claim of disability discrimination fails. Krouse v. American Sterilizer Co., 126 F.3d 494, 502 (3d Cir. 1997).

Further, "[w]hat matters under the ADA are not formalisms about the manner of the request, but whether the employee ... provides the employer with enough information that, under the circumstances, the employer can fairly be said to know of both the disability and desire for accommodation."

24

Drozdowski v. Northland Lincoln Mercury, 321 Fed.Appx. 181, 185 (3d Cir. 2009).

> In order to satisfy the third prong of the prima facie case for retaliation under the ADA, plaintiff must show a "causal link" between the protected activity and the adverse employment decision. LeBoon v. Lancaster Jewish Cmty. Cty. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007). Courts look to "a broad array of evidence" to determine causation, including "temporal proximity," "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *Id*. "[A] gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." Id. at 233.

Gavurnik, 227 F.Supp.3d at 420-21.

In determining whether there is a causal connection between the protected conduct and the adverse employment action, "courts have typically analyzed whether there is temporal proximity between the protected activity and the adverse action, or whether there is a pattern of antagonism by the employer in response to the protected activity." Long v. Spalding Automotive Inc., 337 F.Supp.3d 485, 491 (E.D.Pa. 2018) (citation omitted).

No doubt that the *McDonnell Douglas* burden-shifting framework applies to a retaliation claim under the ADA. Williams, 380 F.3d at 760 n. 3. Thus, if the plaintiff satisfies the prima facie elements of a retaliation claim, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct." Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006). If the employer does so, "the plaintiff must be able to convince the

factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (citation omitted).

TNG argues that plaintiff did not establish a prima face case of retaliation. Again, TNG concedes, only for purposes of its dispositive motion, that plaintiff engaged in protected conduct by requesting an accommodation for her disability, and that she suffered an adverse employment action when her employment was terminated. However, TNG maintains that plaintiff failed to "establish a causal connection between her protected conduct in [June] 2014 (requesting an accommodation) and her termination in [November] 2016."

The court finds that there is no causal nexus between the protected activity when plaintiff requested an accommodation to use a cane in June 2014 and TNG's decision to terminate her employment in November 2016. Nor is there any temporal proximity between plaintiff's request for an accommodation regarding her walking and her termination. Over two years elapsed between the time when plaintiff requested an accommodation and her termination. This large time gap is certainly not unusually suggestive of a retaliatory motive. *See* LeBoon, 503 F.3d at 233 (Third Circuit held that a 3-month gap between the protected activity and the adverse action did not create an inference of causation); Gavurnik, 227 F.Supp.3d at 421 (8-month gap was not sufficient to show causal nexus between the protected activity and the termination decision); Long, 337 F.Supp. 3d at 491 (court held that

nine months lapse between plaintiff's request for an accommodation and his termination "is not 'unusually suggestive' of a retaliatory motive."). Also, as discussed above, plaintiff has failed to produce any evidence showing that her termination was in retaliation for her requested accommodation. To the contrary, TNG granted plaintiff's request for an accommodation to use a cane in June 2014, when she made it.

Nor has plaintiff established a causal connection between her request for an accommodation and her termination through a pattern of antagonism. The only alleged "antagonistic behavior" occurred in June 2015, when plaintiff claims that Baresse asked her if she was coming back to work for the Fall 2015 school term. According to plaintiff, she said "yes, why", and Baresse then said "because of your problem" and told her that she "better be able to walk better and get your own stuff." Plaintiff then responded "this is as good as I am going to get." Plaintiff returned to work for TNG in the Fall of 2015, and she continued to work until she was terminated in November 2016. Baresse denied she made the comment to plaintiff about her knee and her ability to walk. Nonetheless, plaintiff continued to work for TNG for another year and five months after Baresse allegedly made the comment to her and, during this time, she was still being accommodated by TNG which continued to allow her to use a cane since June 2014.

Further, TNG contends that even it the plaintiff established a prima facie case of retaliation, she did not meet her burden of showing that its proffered non-retaliatory reason for terminating her was a pretext for disability

27

discrimination.

As discussed above regarding plaintiff's ADAAA disability discrimination claim, no genuine issues of material fact exist as to whether TNG's legitimate non-discriminatory reasons for plaintiff's termination were merely pretext. "If the employer provides [a legitimate, non-retaliatory reason for its conduct], the plaintiff must then 'be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" Keslosky v. Borough of Old Forge, 66 F.Supp.3d 592, 631 (M.D.Pa. 2014) (citations omitted). Here, as discussed above, the plaintiff has failed to establish by a preponderance of the evidence that TNG's proffered legitimate, non-retaliatory reasons for terminating her were pretextual.

Thus, summary judgment will be granted to TNG with respect to plaintiff's ADA and PHRA retaliation claims. *See* Rubano v. Farrell Area School Dist., 991 F.Supp.2d 678, 709 (W.D.Pa. 2014) (since the court applied the same federal standard to plaintiff's ADA and PHRA retaliation claims and since plaintiff failed to establish a prima facie claim of retaliation under the ADA, the court granted defendant's motion for summary judgment as to both claims).

### D.    *Failure to Accommodate Claims*

Next, plaintiff claims that TNG failed to give her reasonable accommodations for her knee disability.

As the court in Reyer v. Saint Francis Country House, 243 F.Supp.3d

573, 594 (E.D.Pa. 2017), explained:

> The adverse employment decisions barred by the ADA include "not only adverse actions motivated by prejudice and fear of disabilities, but also ... failing to make reasonable accommodations for a plaintiff's disabilities." <u>Mercer v. Se. Penn. Transit Auth.</u>, 26 F.Supp.3d 432, 440 (E.D.Pa. 2014) (quoting <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999)). As such, "[a]n employer's failure to reasonably accommodate the disabilities of an otherwise qualified employee constitutes an adverse employment action under the third element of the prima facie case of generic disability discrimination." <u>Sharbaugh v. W. Haven Manor, LP</u>, 2016 WL 6834613, at *8 (W.D.Pa. Nov. 21, 2016).

Additionally, "the ADA defines discrimination to include 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business.'" *Id*. (citations omitted).

"[F]ailure to accommodate claims 'do not require that an employer's action be motivated by a discriminatory animus directed at the disability and, therefore, the <u>McDonnell Douglas</u> test does not apply." *Id*. at 595 (citations omitted). Additionally, "a plaintiff can assert a failure to accommodate as an independent basis for liability under the ADA and RA." <u>Muhammad v. Court of Common Pleas of Allegheny Cnty., Pa.</u>, 483 Fed.Appx. 759, 763 (3d Cir. 2012); "To make out such a claim, a plaintiff must show that the accommodation he seeks is reasonable, ..., i.e., that it is "necessary to avoid discrimination on the basis of disability." <u>Muhammad</u>, 483 Fed.Appx. at 763

29

(internal citation omitted) (quoting 28 C.F.R. §35.130(b)(7)).

"To establish that an employer breached its duty to provide a reasonable accommodation, a plaintiff must demonstrate: (1) that he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." *Id.* (citations omitted).

> A qualified individual has the burden of identifying an accommodation whose costs do not clearly exceed its benefits. Walton v. Mental Health Ass'n of Southeastern Pennsylvania, 168 F.3d 661, 670 (3d Cir. 1999). Summary judgment may be granted for a defendant only "in cases in which the plaintiff's proposal is either clearly ineffective or outlandishly costly." Id. (citations omitted). "If the plaintiff satisfies his or her burden, the defendant then has the burden to demonstrate that the proposed accommodation creates an 'undue hardship' for it. The ADA defines 'undue hardship' as 'an action requiring significant difficulty or expense, when considered in light of [a series of factors].' Among the factors to be considered are 'the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility.'" *Id.* (quoting 42 U.S.C. §12111(10)(A)(B)).

*Id.*

"If a plaintiff alleges facts that, if proven, would show that an employer should have reasonably accommodated an employee's disability but failed to do so, he establishes that the employer has discriminated against him." Johnson v. McGraw-Hill Companies, 451 F.Supp.2d 681, 700 n. 11 (W.D.Pa. 2006).

The evidence shows that in June 2014, plaintiff requested to use a cane to assist with her walking at work, after being told by TNG that she could not

use the food cart for this purpose, and TNG granted plaintiff's request. In fact, plaintiff's doctor recommended that she be allowed to use the cane at work. There is no evidence that prior to the June 2014 meeting TNG had allowed plaintiff to use the food cart as an accommodation to assist her walking while at work. Plaintiff was then allowed to use her cane to walk while at work without interruption until her termination in November 2016. Thus, plaintiff cannot proceed on a failure to accommodate claim based on her request to use a cane.

Plaintiff also claims that she requested to use the kitchen food cart as a reasonable accommodation. Baresse, Baranowski, and Drank aver that plaintiff did not make a request to use the food cart as an accommodation to assist her walking at work. The evidence shows that at the June 2014 meeting, plaintiff was specifically told by TNG management that she was seen using the food cart to assist her walking and to support her weight and that she could not use the food cart in such a manner because it was unsafe and violated TNG's safety policy. She was also told that such use of the food cart put her safety and the safety of others at risk. After this was explained to plaintiff, she then requested to use a cane as a reasonable accommodation and her request was granted. Further, Dr. Kazmierski opined that plaintiff needed to use her cane at work. He made no mention that plaintiff required to use the food cart to assist her walking. Additionally, plaintiff was at all times allowed to use the food cart by TNG for its intended purpose to assist with her duties, such as transporting items, but not to assist with her walking. As such,

the evidence shows that TNG made reasonable efforts to determine the proper accommodation for plaintiff and to assist her as required under the ADA. *See* <u>Williams</u>, 380 F.3d at 761.

Plaintiff testified that she was never told that using the food cart was a safety risk, that her use of the cart never presented any safety issues, and that she always used the cart at work which was required for 99% of her duties. However, based on plaintiff's job duties detailed above, it is clear that she did not need a food cart for almost all of her duties. Moreover, plaintiff's subjective belief that her use of the food cart was not a safety violation is belied by TNG's evidence that plaintiff was repeatedly seen by several people using the cart to assist her walking and that this presented a safety risk to plaintiff and to other workers since it could tip as this was not the intended use of the cart.

Additionally, at her deposition, plaintiff testified that she had to use the cart "99% of the time" "to do something" and carry objects in the kitchen, but she admitted that she did not know if she directly asked TNG supervisors to use the cart to assist her in walking or moving around in the kitchen.

Even if plaintiff did request to use the food cart to assist her walking at work as an accommodation, a proposed accommodation must be reasonable. *See* <u>Solomon v. School Dist. of Philadelphia</u>, 882 F.Supp.2d 766, 780 (E.D.Pa. 2012). TNG's evidence shows that this proposed accommodation was not reasonable. On the other hand, plaintiff's ongoing accommodation provided by TNG of allowing her to use her cane at work was reasonable.

"'[A]n employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided,' inasmuch as 'the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.'" Solomon, 882 F.Supp.2d at 779 (internal citations omitted). The employer can also chose a safer accommodation and reject a requested accommodation that is in violation of its safety policies. In fact, "an employer is not required to provide a reasonable accommodation if it would pose a 'direct threat' to the safety of the employee or others." Turner v. Hershey Chocolate U.S., 440 F.3d 604, 614 (3d Cir. 2006) (citing Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 78-79, 122 S.Ct. 2045 (2002) ("an employer is not required to accommodate an employee if the accommodation threatens the health or safety of that employee or other employees")). As extensively detailed above, the undisputed evidence shows that the use of a food cart by plaintiff to assist her with walking and to support her weight was not safe, was not the intended use of the cart, and was in violation of TNG's safety policies. Nor is a food cart a recognized medical device to be used as a walker.

Thus, TNG's motion for summary judgment with respect to plaintiff's failure to accommodate claims under the ADA and the PHRA will be granted. *See* Bielich, 6 F.Supp.3d at 617 (the analysis of plaintiff's ADA and PHRA failure to accommodate claims are identical and the court's determination with respect to this claim under the ADA "applies with equal force to the PHRA

claim.") (citation omitted).

## IV.    CONCLUSION

Based on the foregoing reasons, TNG is entitled to summary judgment as to the plaintiff's disability discrimination claims, her failure to accommodate claims and her retaliation claims under the ADAAA and the PHRA. As such, TNG's motion for summary judgment will be granted as to all of plaintiff's claims in her amended complaint. For the same reasons, plaintiff's motion for partial summary judgment motion regarding her disability discrimination claims will be denied.

An appropriate order shall issue.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: August 13, 2019**

17-2417-01.wpd